# Richmond

## NATIONAL BANK AND TRUST COMPANY AT CHARLOTTESVILLE v. BERN F. CASTLE, ET AL.

January 17, 1955.

Record No. 4301.

Present, Hudgins, C.J., and Eggleston, Spratley, Buchanan, Miller and Smith, JJ.

The opinion states the case.

*John S. Battle, Jr.,* for the plaintiff in error.

*Thomas J. Michie, Bruce D. Reynolds, Jr., E. C. Wingfield, Richard A. Jackson, W. W. Wharton, Allyn L. Larkum* and *E. H. Copenhaver,* for the defendants in error.

Spratley, J., delivered the opinion of the court.

The principal question presented on this appeal is the effect of a written assignment of an account receivable, made by the Albemarle Plumbing and Heating Company, Inc., to the National Bank and Trust Company at Charlottesville, Virginia.

On June 22, 1950, Bern F. Castle, trading as Castle Construction Company, hereinafter referred to as Castle or General Contractor, entered into a contract with the School Board of the City of Charlottesville for the construction of a municipal school building in Charlottesville. The contract, sometimes hereinafter referred to as the General Contract, is evidenced in a standard form of agreement between contractor and owner for the construction of buildings prepared by the American Institute of Architects. One of its General Conditions, Article 30, provides that:

"The Owner shall have the right * * * to require the Contractor to furnish bond covering the faithful performance of the Contract, and the payment of all obligations there-

under, in such form as the Owner may prescribe and with such sureties as he may approve."

The performance bond, with surety, was accordingly furnished. So far as is material here, it reads as follows:

"Now, THEREFORE, if Principal [Castle] shall.......... pay all persons who have furnished labor or material for use in or about the improvement and shall indemnify and save harmless the Owner from all cost and damage by reason of Principal's default or failure so to do, then this obligation shall be null and void; otherwise it shall remain in full force and effect.

"All persons who have furnished labor or material for use in or about the improvement shall have a direct right of action under the bond, subject to the Owner's priority."

On July 7, 1950, Albemarle Plumbing and Heating Company, Inc., hereinafter referred to as Albemarle, entered into a contract with Castle for the installation of certain plumbing, heating and ventilation equipment in the building. That contract reads, in part, as follows:

"We propose to install the plumbing, heating and ventilation systems in accordance with plans and specifications prepared by Stainback & Scribner for the sum of $74,000.00 (Seventy-Four Thousand Dollars)."

The plans and specifications above mentioned contained the following clause with reference to the plumbing, heating and ventilation of the building:

"GENERAL CONDITIONS: The General Conditions form part of this Specification and Contract, and shall be carefully examined by each Bidder before submitting proposal. Where general condition clauses are repeated in this Specification, it shall be understood as calling especial attention to them, or as a further qualification, and shall not be assumed as omitting any other part of the General Condition clause. No General Condition clause referring to the work included herein shall be considered as waived unless specifically stated herein."

Article 37 of The General Conditions of the contract reads as follows:

"Relations of Contractor and Subcontractor. The Contractor agrees to bind every Subcontractor and every Subcontractor agrees to be bound by the terms of the Agreement, the General Conditions, the Drawings and Specifications as far as applicable to his work, including the following provisions of this article, unless specifically noted to the contrary in a subcontract approved in writing as adequate by the Owner or Architect.

"This does not apply to minor subcontracts.

"The Subcontractor agrees—

"(a) To be bound to the Contractor by the terms of the Agreement, General Conditions, Drawings and Specifications, and to assume toward him all the obligations and responsibilities that he, by those documents, assumes toward the Owner."

Among the obligations of the Contractor towards the Owner, which the Subcontractor assumed toward Castle were the following:

"Article 9. Materials, Appliances, Employees. Unless otherwise stipulated, the Contractor shall provide and pay for all materials, labor, water, tools, equipment, light, power, transportation and other facilities necessary for the execution and completion of the work."

"Article 26. Payments Withheld. The Architect may withhold or, on account of subsequently discovered evidence, nullify the whole or a part of any certificate to such extent as may be necessary to protect the Owner from loss on account of:

\* \* \* \* \*

"(b) Claims filed or reasonable evidence indicating probable filing of claims.

"(c) Failure of the Contractor to make payments properly to Subcontractors or for material labor.

"(d) A reasonable doubt that the contract can be completed for the balance then unpaid.

\* \* \* \* \*

"When the above grounds are removed payment shall be made for amounts withheld because of them."

"Article 31. Damages. If either party to this Contract should suffer damage in any manner because of any wrongful act or neglect of the other party or of anyone employed by him, then he shall be reimbursed by the other party for such damage."

"Article 33. Assignment. Neither party to the Contract shall assign the Contract or sublet it as a whole without the written consent of the other, nor shall the Contractor assign any moneys due or to become due to him hereunder, without the previous written consent of the Owner."

On January 15, 1951, Albemarle negotiated a loan in the sum of $8,000 from the National Bank and Trust Company at Charlottesville, hereafter referred to as plaintiff or as the Bank. It executed a note therefor, payable six months after date, and as collateral security made a written assignment to the Bank of the accounts receivable by it from the Venable School Project, in the designated amount of $10,610.05. The loan was made upon the express representation that the proceeds would be used by Albemarle to meet its payroll on the project named. Giving effect to certain curtails, the balance due on the note is $4,749.35, with interest from October 16, 1951.

On June 4, 1951, the Bank gave written notice of the above assignment to Castle. Prior thereto, Shultz and James, Inc., and Johnson Service Company, subcontractors of Albemarle, had given written notice to Castle that they had not been paid for materials furnished by them to Albemarle for the project. Upon receipt of these notices, Castle found out from Albemarle that it had not paid other materialmen. These materialmen, six in number, gave notices, oral or written, at various times before and subsequent to June 4th, to Castle of the non-payment of their accounts, and demanded payment from Castle in accordance with the provisions of his General Contract and performance bond. The unpaid claims of all the materialmen amounted to $12,407.26.

The school building was completed and accepted by the School Board on October 9, 1952. Final payment was made in due course, including $10,916.89, which represented the

balance of the agreed contract price for the installation of plumbing and heating equipment by Albemarle, there being no objection to the quality of the work performed by the latter.

The Bank, unable to collect the balance due on its note from Albemarle, made demand upon Castle for payment by virtue of the assignment. Castle refused to make payment, and on October 14, 1952, the Bank instituted this proceeding by a motion for judgment. Castle filed his grounds of defense and interpleaded, without objection, the unpaid materialmen in accordance with Code, § 8-226. He averred that he did not collude with the materialmen, and was ready to pay or dispose of the amount in his hands as the court might direct. Several of the interpleaded materialmen appeared, stated their claims, and joined Castle in his defense of the action.

Upon consideration of the facts and the law, the trial court, in a written opinion, held that the rights of the Bank, as assignee, were subject to the claims of the materialmen against the said sum of $10,916.89, and that since that fund was not sufficient to pay the materialmen in full, judgment would be entered directing a *pro rata* distribution among them. From a judgment entered accordingly, we granted this appeal.

■ The Bank contends that its assignor, Albemarle, having performed all of the work required under its contract in a proper and workmanlike manner, was entitled to be paid the full amount agreed upon, and it, the Bank, having taken for consideration an assignment perfect on its face, was entitled to assert it in accordance with Code, sections 8-94[1]

---

[1] "The assignee or beneficial owner of any bond, note, writing or other chose in action, not negotiable, may maintain thereon in his own name any action which the original obligee, payee, or contracting party might have brought, but shall allow all just discounts, not only against himself, but against such obligee, payee, or contracting party, before the defendant had notice of the assignment or transfer by such obligee, payee, or contracting party, and shall also allow all such discounts against any intermediate assignor or transferrer, the right to which was acquired on the faith of the assignment or transfer to him and before the defendant had notice of

and 11-5.[2] It insists that Castle was not entitled to "set off" against the assignee any of the "discounts" contemplated by those sections which he could not have enforced prior to the receipt of notice of the assignment. In this connection it claims that as of the date of the receipt of such notice the claims of the materialmen were claims against Albemarle only, save and except those who had given to Castle proper notice of Albemarle's default.

The Bank further contends that the trial court erred in admitting in evidence Castle's performance bond; and that Castle by interpleading the materialmen waived his right to take a partisan position in the proceeding.

Castle and his codefendants take the position that the assignment to the Bank covered only such sum as would become due Albemarle under its contract with Castle; that nothing ever became due to Albemarle because its failure to pay its subcontractors resulted in placing the obligation to pay them upon Castle; that, therefore Castle never came to owe Albemarle anything on its subcontract; and consequently there is nothing on which the assignment can operate. Castle relies specifically upon his right of recoupment, and upon Article 33 of the contract prohibiting an assignment by any party.

Code, § 8-94 has been in force in Virginia, in one form or another, since 1705. Its earlier history is reviewed in *Stebbins and Lawson* v. *Bruce*, (1885) 80 Va. 389. In that case the court said at page 397:

"It is the settled law of this state that the assignee of any

---

the assignment or transfer by such assignor or transferrer to another. (Code 1919, § 5768.)"

[2] "All written assignments made in good faith, whether in the nature of a sale, pledge or otherwise, of accounts receivable and amounts due or to become due on open accounts or contracts shall be valid, legal and complete, and shall be deemed to have been fully perfected, without notice to the debtor of such assignment. Such assignments shall take effect according to their terms and be valid and enforceable, as of the respective dates thereof, against all persons whomsoever and in any event. (1944, p. 318; Michie Suppl. 1946, § 5767a.)"

bond, note or writing, not negotiable, stands in the shoes of the assignor; or, in other words, the assignment is subject to all the equities of the debtor against the assignor until notice of the assignment. Code 1873, Ch. 141, section 17; *Norton* v. *Rose*, 2 Wash. (2 Va.) 233; *Feazle* v. *Dillard*, 5 Leigh (32 Va.) 30; *Etheridge* v. *Parker*, 76 Va. 247."

Furthermore, at page 400 of the same case, we find:

"It has been repeatedly held that the statute did not intend to abridge the rights of the obligor, nor to enlarge those of the assignee beyond that of suing in his own name. (*Gordon* v. *Rixey*, 76 Va. 694)."

More recently we said in *Hartford Fire Insurance Co.* v. *Mutual Savings etc. Co.*, 193 Va. 269, 277, 68 S. E. (2d) 541;

"An assignee or pledgee of a non-negotiable paper, steps into the shoes of the assignor, or pledgor, and takes the assignment subject to all defenses of the obligor against the assignor, or pledgor, existing before notice of assignment."

Code, sections 11-5 and 11-6 were first enacted in 1944 following the decision in *Corn Exchange National Bank and Trust Co.* v. *Klauder*, 318 U. S. 434, 63 S. Ct. 679, 87 L. ed. 884, in which it was held that, in a State which followed the so-called "English rule", an assignment of accounts receivable was not effective until the debtor was notified, though made more than four months before bankruptcy, and for value received at the time it was made. In such instances it followed that the lien created by an assignment of accounts receivable was not deemed to have been perfected until notice was given, which in many cases might not happen until after bankruptcy had intervened.

That case and the results thereof are ably discussed at length in 32 Virginia Law Review (1946) 910, wherein it is said, (page 932) that, within a few years after the decision, statutes on the subject of assignments were passed in twenty-five States, of which fifteen, including Virginia's statute, "embody the so-called New York or validation principle, eight the requirement of recording, and two the book-marking doctrine." The author, in a footnote on page 915, lists

Virginia as one of the States "in which the law was in almost complete doubt" until the enactment of this legislation.

It seems clear that the intent of the legislature in enacting section 11-5 was merely to change the effect in bankruptcy of an assignment of accounts receivable as that effect had been declared in the *Corn Exchange case, supra,* so that now the lien will be as the statute says, "valid, legal, and complete, and shall be deemed to have been fully perfected without notice to the debtor."

There is no language to indicate that it was intended to change the general law with regard to the right of a debtor to assert against an assignee "all just discounts" allowable under § 8-94, or to deny recoupment to a debtor when he sought to cut down or diminish the claim of the assignor because he had violated some duty in the performance of his contract with the debtor.

The General Contract between the School Board and Castle must be read and considered in connection with the performance bond of Castle. They measured the extent of Castle's undertaking, an undertaking which required him to "provide and pay for all materials, labor, * * * necessary for the execution and completion of the work." *C. S. Luck & Sons* v. *Boatwright,* 157 Va. 490, 162 S. E. 53; *Fidelity and Casualty Co. of N. Y.* v. *Copenhaver Contracting Co.,* 159 Va. 126, 165 S. E. 528.

The above cited cases, sheared of any side issues, dealt with performance bonds less broad and comprehensive than the bond in this case.

Under the plain language of the contract, Article 9, and the covenants of the bond, under review here, Castle was liable for the claims for labor and material furnished for the building covered in his contract. Albemarle, in its contract with Castle, agreed to be bound to Castle and to assume toward Castle "all the obligations and responsibilities that he (Castle) by those documents assumes toward the Owner." (Article 37(a)). Thus, Albemarle assumed the requirements of the General Contract and bond, and made a contractual obligation with Castle to pay for all materials supplied to it

on the job. The defense urged by Castle is a claim which arose out of the very same transaction, on which any liability of Castle to Albemarle must be predicated. The failure of Albemarle to pay its materialmen resulted in the creation of the claim of Castle. By reason of its default, nothing ever became due from Castle to Albemarle. There was never a time when Albemarle could have successfully sued Castle. The Bank, as assignee of Albemarle, stood in its shoes, and since Albemarle could not have recovered against Castle, its assignee cannot recover.

■ We are dealing here with the right of recoupment, not with set-off, an entirely different right. In Burk's Pleading and Practice, 4th Ed., the distinction between set-off and recoupment is clearly stated. In section 241, at page 430, set-off is thus defined:

"Set-off is a counter demand of a liquidated sum growing out of a transaction extrinsic to the plaintiff's demand, for which an action on contract might be maintained by the defendant against the plaintiff and which is now exhibited by the defendant against the plaintiff for the purpose of counterbalancing in whole or in part the plaintiff's demand, and, where it exceeds the plaintiff's demand, of recovering a judgment in his own favor for the excess."

In Section 247, page 438, we find this definition of recoupment:

"Recoupment, therefore is the right of the defendant to cut down or diminish the claim of the plaintiff in consequence of his failure to comply with some provision of the contract sought to be enforced, or because he has violated some duty imposed upon him by law in the making or performance of that contract. The delinquency or deficiency which will justify the reduction of the plaintiff's claim must arise out of the same transaction, and not out of a different transaction."

This definition of recoupment is in accord with the law stated by all of the authorities and followed generally by the courts. American Law Institute's Restatement of the Law

of Contracts, Vol. 1, page 219; Corbin on Contracts, Vol. 4, section 895, page 591; 2 Williston, Contracts, (Revised Edition, 1936) sec. 433; *American Bridge Co. of New York* v. *Boston*, 202 Mass. 374, 88 N. E. 1089; *Bliss* v. *California Co-Op Producers*, 30 Cal. (2d) 240, 181 Pac. (2d) 369.

In 47 Am. Jur., Setoff and Counterclaim, Section 33, page 734, this is said:

"In an action by an assignee of a contract, which is entire, the defendant may set up in recoupment a breach of the contract occurring after the assignment."

Plaintiff has cited and we have found no case where recovery was allowed when the equity sought to be recouped arose out of the same transaction. The cases cited by the plaintiff on the question of set-off are not in point here.

The non-payment of the materialmen was a defense available to Castle at all times before and after the assignment. Castle was entitled to be discharged of his liability to Albemarle's materialmen before he was required to pay anything to Albemarle under the contract. Since Albemarle never had any enforceable right against Castle, the assignee stood in no better position, and hence acquired no rights against Castle.

We find no merit in the Bank's contention that the trial court erred in admitting in evidence Castle's performance bond. The bond was referred to in Castle's grounds of defense and in his affidavit under § 8-226 as the basis for interpleading the materialmen. To leave the bond out of the case would be comparable to excluding Hamlet from Shakespeare's great Danish tragedy,—and as logical. The plaintiff did not object to the materialmen being brought into the case, and it is obvious their rights could not be determined without a consideration of the bond.

Nor do we agree that Castle by filing the interpleader affidavit waived the right to take a partisan position. The affidavit shows on its face that Castle did take a partisan position. His defense was based on the contract, the bond, and the fact that under it, he would be required to pay twice

for the material, that is, to pay both the materialmen and the assignee of Albemarle, if the assignee were allowed to recover. Castle, therefore, asserted in his pleading that the assignment was of no effect, and that the money in his hands was due to the materialmen rather than to the assignee. Moreover, it is immaterial what position Castle has taken, inasmuch as his codefendants take the position set out by Castle in his pleadings.

In view of the conclusion which we have reached, it is unnecessary to consider the effect of the provision in the contract declaring, "nor shall the Contractor assign any moneys due or to become due to him hereunder, without the previous consent of the Owner." (Article 33 of the General Conditions required by Article 37(a), to be assumed by the subcontractor.)

For the foregoing reasons we affirm the judgment of the trial court.

*Affirmed.*