COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Athey, Causey and Callins
Argued at Winchester, Virginia


UNDER WILD SKIES, INC.

v.       Record No. 1956-22-4

NATIONAL RIFLE ASSOCIATION OF AMERICA          MEMORANDUM OPINION* BY
                                               JUDGE CLIFFORD L. ATHEY, JR.
NATIONAL RIFLE ASSOCIATION OF AMERICA                  JULY 9, 2024

v.       Record No. 1965-22-4

UNDER WILD SKIES, INC.


FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Christie A. Leary, Judge

T. Wayne Biggs (Clifford Clapp; Skyler Peacock; Dycio & Biggs, on
briefs), for Under Wild Skies, Inc.

James W. Hundley (Robert H. Cox; William A. Brewer; Ramon
Hernandez; Briglia Hundley, P.C.; Brewer, Attorneys & Counselors,
on briefs), for National Rifle Association of America.


Beginning on September 12, 2022, the Circuit Court of Fairfax County ("circuit court")

held a six-day jury trial involving a contract dispute between Under Wild Skies, Inc. ("UWS")

and the National Rifle Association ("NRA"), which resulted in a verdict in UWS's favor.  In

Record No. 1956-22-4, UWS contends on appeal that the circuit court erred: (1) by rejecting

their proposed Jury Instruction 21 and (2) by denying their motion to set aside the jury's verdict

as a result of the circuit court's failure to give Jury Instruction 21.  NRA contends on cross-

appeal in Record No. 1965-22-4 that the circuit court erred: (1) by denying their motion to set

---

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

aside the verdict on Counts I and II of UWS's complaint, (2) by striking their affirmative defense of fraudulent invoicing, and (3) by striking their affirmative defense of recoupment. Finding no error, we affirm the judgment of the circuit court in these consolidated appeals.

## I. BACKGROUND

UWS owned and produced a television program hosted by Anthony Makris ("Makris"). The program was dedicated to hunting various big and small game at numerous locations while utilizing many different types of firearms. In 2018, NRA entered into a new sponsorship agreement and advertising agreement ("agreements") with UWS, continuing its long-term sponsorship of the television program. Though not executed until 2018, the new agreements covered the period beginning on January 1, 2016, and ending on December 31, 2025. The agreements provided for UWS to deliver 13 new episodes a year in exchange for NRA paying certain fees for advertisement on and sponsorship of the television program. Pursuant to the agreements, NRA was required to make equal payments to UWS which were due on or before March 1, May 1, July 1, and September 1 of each year.

In July of 2019, as a part of a general review of third-party vendor agreements, NRA sent UWS a letter requesting information about the television program, including data regarding the episodes' airtime, viewership, marketing, and sponsorship. UWS initially resisted providing the requested data, stating that it was not contractually required to provide the requested metrics to NRA. Further alleging that NRA's request was "unprecedented," UWS asserted that NRA's request could "be interpreted as anticipatory breach of the agreement between the parties." UWS ultimately responded by providing the requested information to NRA on August 5, 2019. The information provided to NRA indicated that viewership of the television program was "dismal."

While NRA was reviewing the UWS's response, NRA failed to pay the September 1, 2019 payment due pursuant to the previously executed agreements. As a result of this missed

payment, UWS filed an amended complaint alleging that NRA: (1) breached the advertising agreement (Count I); (2) breached the sponsorship agreement (Count II); (3) anticipatorily breached the advertising agreement (Count III); and (4) anticipatorily breached the sponsorship agreement (Count IV).  UWS's complaint sought a total of $17 million dollars in damages.  In response, NRA filed a demurrer and an answer claiming a number of affirmative defenses including fraudulent invoicing, setoff, and recoupment.  NRA also filed two counterclaims, alleging that UWS had breached both the advertising and sponsorship agreements by failing to deliver all 13 episodes scheduled to air in 2018.  NRA sought a total of $10 million dollars in damages through its counterclaims.  UWS filed an answer to the counterclaims both denying NRA's counterclaims while also asserting several affirmative defenses to the counterclaims.

The circuit court conducted a six-day jury trial beginning on September 12, 2022, and ending on September 20, 2022.  NRA entered into evidence 24 supplemental invoices previously paid to UWS totaling $97,500.  Each of the 24 paid invoices had been previously submitted to NRA for payment from 2016 through 2019.  In reference to these supplemental invoices, NRA's counsel asked Wayne LaPierre ("LaPierre"), who testified in his capacity as Executive Vice President of NRA, "did Mr. Makris ask you for additional monies for the Under Wild Skies show?" LaPierre responded:

> Yes, correct.  Mr. Makris, Tony, came to me and talked about [sic] the show was breaking even and if we were going to continue to have NRA people on the show or he was going to have celebrities on the show or he's going to host these sponsorship events that we did during hunting conventions around the country or the shot show . . . we would need to do supplementals.  Which were, actually, not a part of the original contracts.  They were just a verbal agreement that we had with Mr. Makris that as long as we felt they were effective we could continue to do them.

LaPierre further testified that this conversation with Makris occurred sometime in the 2000s.

- 3 -

LaPierre was then asked if Makris had ever stated "that [the] supplementals were to pay for event planning or donor development services that he was going to be doing on behalf of the NRA?" LaPierre responded,

> [t]hey were to pay for these events that he would host after, like, Safari Club International, in part, they would pay for that, or Dallas Safari Club, where after the show floor closed, he would invite people over and there would be NRA people there, Under Wild Skies would sponsor it with the NRA, and we would get to meet people, we would get to talk, we would develop friendships out of those events, and hopefully convince them that NRA was a hunting organization and that besides being members of Safari Club or Dallas Safari Club, they need -- NRA was a hunting organization, they ought to join the NRA and maybe down the road, giving back, get involved, and maybe down the road give a donation.

LaPierre denied that Makris was being compensated for fundraising work or event planning for NRA: "The supplementals never had anything to do with Tony Makris as a fundraiser." He stated that the supplemental payments,

> had to do with what I've described, the additional costs of putting NRA people on the show, or celebrities on the show, or the cost of these events or smokers or whatever you want to call them. But I mean, he wasn't retained by the NRA as a fundraiser. If he had been, it would have had to had been under a separate contract with the appropriate signatures that would have -- that's the only way it would have made it through our accounting division, if it was done that way.

Makris subsequently testified that LaPierre initiated a conversation with him about his desire to cultivate large donors for NRA and that Makris responded with the idea of reaching out to attendees at major hunting and shooting tradeshows. He testified that a plan was developed for him to host events in the evenings at these trade shows to facilitate exposure for NRA and networking with attendees at these conventions. He explained that at a certain point, he approached LaPierre about being compensated for the extra work of organizing these events and engaging in the subsequent networking. According to Makris, the supplemental payments system was the vehicle NRA used to compensate Makris for the extra work.

- 4 -

At the conclusion of UWS's evidence, NRA moved to strike Counts III and IV, which the circuit court denied. At the close of all the evidence, the circuit court denied NRA's renewed motion to strike, denied UWS's motion to strike NRA's counterclaims, and granted UWS's motion to strike NRA's affirmative defenses of fraudulent invoicing, setoff, and recoupment. In granting the motion to strike the affirmative defense of fraudulent invoicing, the circuit court reasoned that the supplemental payments were made pursuant to a separate oral contract outside of the advertising and sponsorship agreements between NRA and UWS.

During the circuit court's consideration of proposed jury instructions submitted by the parties, UWS requested that the circuit court instruct the jury as provided in their proposed Jury Instruction 21, which stated:

> Where reasonable grounds arise to believe that one party to a contract will commit a breach by non-performance that would:
>
> 1. Of itself constitute a repudiation of the contract, or
>
> 2. So substantially impair the value of the contract to the other party at the time of the breach that it is just in the circumstances to allow him to recover damages based on all his remaining rights to performance
>
> The other party may demand adequate assurance of due performance and may, if reasonable, suspend any performance for which he has not already received the agreed exchange until he receives such assurance. The non-breaching [party] may treat as a repudiation the breaching party's failure to provide within a reasonable time such assurance of due performance as is adequate in the circumstances of the particular case.

Following argument, the circuit court rejected UWS's proposed Jury Instruction 21, finding that the proposed instruction, if given, would constitute the circuit court "comment[ing] on the evidence."

The jury was also instructed as to a first breach: "If a party commits the first breach of a contract, and the breach is a material breach, that party is not entitled to enforce the contract"; material breach: "A material breach of contract occurs if a party fails to do something which that

party is bound to do according to the contract which is so important and central to the contract that the failure defeats the very purpose of the contract"; and waiver: "A waiver occurs when a party intentionally gives up a [contractual; legal] right which would have been beneficial to him. A waiver may be expressly stated or it may be implied from conduct. A party cannot waive a right unless he has full knowledge of it." (Brackets in original).

Following closing arguments and the jury's deliberations, the jury returned their verdict in favor of UWS on Counts I and II but against UWS on its anticipatory breach claims in Counts III and IV. The jury also found against NRA on their counterclaims. As a result, the jury awarded damages to UWS in the amount of $550,000, plus interest. NRA moved to set aside the jury's verdict denying NRA's counterclaims, and UWS moved to set aside the jury's verdict denying Counts III and IV of UWS's complaint. The circuit court denied both parties' motions to set aside the verdict. Both NRA and UWS appealed.

## II. ANALYSIS

### A. *Standard of Review*

Properly instructing the jury "rests 'in the sound discretion of the trial court.'" *Pena Pinedo v. Commonwealth*, 300 Va. 116, 121 (2021) (quoting *Cooper v. Commonwealth*, 277 Va. 377, 381 (2009)). The sole purpose of appellate review of jury instructions is "to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises." *Dorman v. State Indus., Inc.*, 292 Va. 111, 125 (2016) (quoting *Cain v. Lee*, 90 Va. 129, 134 (2015)). "We review a trial court's decisions in giving and denying requested jury instructions for abuse of discretion." *Conley v. Commonwealth*, 74 Va. App. 658, 675 (2022). "Whether a proffered jury instruction accurately states the law, however, is reviewed *de novo*." *Holmes v. Commonwealth*, 76 Va. App. 34, 53 (2022). "And in deciding whether a particular instruction is

appropriate, we view the facts in the light most favorable to the proponent of the instruction." *Cooper*, 277 Va. at 381.

"We review a circuit court's decision on a motion to strike in the light most favorable to the non-moving party, and the non-moving party 'must be given the benefit of all substantial conflict in the evidence, and all fair inferences that may be drawn therefrom.'" *Dill v. Kroger Ltd. P'ship I*, 300 Va. 99, 109 (2021) (quoting *Egan v. Butler*, 290 Va. 62, 73 (2015)). We review de novo questions of law. *Eley v. Commonwealth*, 70 Va. App. 158, 162 (2019).

"As a general rule, [this Court] will not set aside a [circuit] court's judgment sustaining a jury verdict unless it is 'plainly wrong or without evidence to support it.'" *N. Va. Kitchen, Bath & Basement, Inc. v. Ellis*, 299 Va. 615, 622 (2021) (second alteration in original) (quoting *Parson v. Miller*, 296 Va. 509, 524 (2018)). Where the circuit court has denied a motion to set aside a jury verdict, "the standard of appellate review in Virginia requires this Court to consider whether the evidence presented, taken in the light most favorable to the plaintiff, was sufficient to support the jury verdict in favor of the plaintiff." *Id.* (quoting *Parson*, 296 Va. at 523-24).

B. *The circuit court did not err in denying UWS's proposed Jury Instruction 21 because Virginia law does not recognize the doctrine of reasonable assurances.*

On appeal, UWS challenges the circuit court's rejection of its proposed Jury Instruction 21, alleging that the proposed instruction correctly stated the law and was supported by more than a scintilla of evidence. We disagree.

The doctrine of anticipatory repudiation is a settled part of the law of contracts in Virginia. *See Bennet v. Sage Payment Sols., Inc.*, 282 Va. 49, 55-58 (2011). It does not necessarily follow, as UWS asserts, that the doctrine of reasonable assurances is also the law of this Commonwealth. UWS acknowledges on brief that no Virginia case has addressed the issue they raise on appeal. UWS instead contends that the doctrine of reasonable assurances is an integral component of the doctrine of anticipatory repudiation as shown by its adoption by other

- 7 -

states and its inclusion in the Restatement (Second) of Contracts.  However, UWS points to no

Virginia authority supporting this assertion, beyond favorable references to other provisions in

the Restatement (Second) of Contracts.[1]  And we note that each of those favorable references

was paired with a citation to binding Virginia authority for the same proposition quoted from the

Restatement.

In essence, UWS is asking for this Court to extend the law of contracts in Virginia.  It is

not so bold as to make that assertion directly and instead attempts to suggest that because

Virginia law contemplates anticipatory repudiation, the doctrine of reasonable assurances must

already be incorporated into Virginia law.  We decline to extend the law as proposed.  As a

result, since no Virginia authority has recognized the doctrine of reasonable assurances, we

cannot therefore conclude that the circuit court erred in refusing proposed Jury Instruction 21.[2]

Thus, since we find that the circuit court did not err in denying Jury Instruction 21, we

also, necessarily conclude that the circuit court did not err when it denied UWS's motion to set

aside the jury's verdict on the grounds that it failed to give said jury instruction.

---

[1] For examples of Virginia courts' use of the Restatement (Second) of Contracts, UWS cites *Bennet*, 282 Va. at 57-59; *Wood v. Martin*, 299 Va. 238, 247-49 (2020); *Tingler v. Graystone Homes, Inc.*, 298 Va. 63, 105-06 (2019); *Dominion Res. Inc. v. Alston Power, Inc.*, 297 Va. 262, 271 (2019); *Kerns v. Wells Fargo Bank, NA*, 296 Va. 146, 160 (2018).

[2] Because this Court must resolve appeals "on the best and narrowest grounds available," *Butcher v. Commonwealth*, 298 Va. 392, 396 (2020) (quoting *Commonwealth v. White*, 293 Va. 411, 419 (2017)), and because we may affirm a trial court for reaching the right result though for a different reason, *see Peters v. Commonwealth*, 72 Va. App. 378, 388-89 (2020), we do not address whether the circuit court was correct in deciding it could not offer the proposed jury instruction without commenting on the evidence.  Regardless of whether that decision was correct, UWS has failed to show that the proffered instruction was a correct statement of the law in Virginia, and that failure is sufficient reason to affirm the circuit court.

C. *The circuit court did not err in denying NRA's motion to set aside the jury verdict because whether UWS first materially breached the contract was a question of fact determined by the jury and the jury's decision was supported by the evidence.*

NRA assigns error to the circuit court's denial of its motion to vacate the jury's verdict. NRA asserts that UWS first breached the agreements and therefore the jury's verdict as to UWS's Counts I and II, finding NRA had breached the agreements was unsupported by the evidence. NRA also argues that because the UWS first breached the agreements, the jury's verdict denying NRA's counterclaims against UWS alleging breach of contract was also unsupported by the evidence. In support thereof, NRA contends that "the evidence established as a matter of law" that UWS was the first party to breach the contract. Hence, NRA concludes that UWS had no right to enforce the agreements against NRA. Instead, NRA asserts that it was entitled to compensation for UWS's breach. Finally, NRA contends that the circuit court further erred by refusing to set aside the jury's verdict when UWS's breach of contract claims were based on insufficient evidence. We disagree.

"A material breach is a failure to do something that is so fundamental to the contract that the failure to perform that obligation defeats an essential purpose of the contract." *Horton v. Horton*, 254 Va. 111, 115 (1997). "The type of evidence required to establish a material breach of contract will vary depending on the facts surrounding a particular contract." *Id.* at 116.

Here, the record reflects that UWS produced 11 of the 13 contemplated episodes scheduled for airing in 2018. The jury was instructed that, "[i]f a party commits the first breach of a contract, and the breach is a material breach, that party is not entitled to enforce the contract"; and that "[a] material breach of contract occurs if a party fails to do something which that party is bound to do according to the contract which is so important and central to the contract that the failure defeats the very purpose of the contract." NRA assigned no error to the relevant jury instructions.

NRA also failed to object to the jury deciding the materiality of the alleged breach. Hence, the question of whether the failure by UWS in 2018 to produce two of the contemplated thirteen episodes pursuant to the contract was a question of fact correctly determined by the jury, not a question of law. As a result, we decline to accept NRA's invitation to now find that the circuit court erred by treating the question of materiality of the alleged breach as a question of fact for the jury rather than a question of law. Moreover, after applying the deferential standard of review applicable here, we cannot find that the jury's decision that UWS's breach was not material lacked evidence to support it. It is well established that not every breach of contract is a material breach; "[a] material breach is a failure to do something that is so fundamental to the contract that the failure to perform that obligation defeats an essential purpose of the contract." *Horton*, 254 Va. at 115. Here, 11 of the 13 episodes contemplated by the agreements were produced. Hence, the jury's decision that the essential purpose of the agreements had not been defeated is not plainly wrong or without evidence to support it.[3]

Moreover, the record reflects that NRA breached the agreements by failing to make the September 2019 payment on time. NRA argues on appeal that the failure to make the payment was not a breach of contract at all, but merely a delay in meeting the terms of the contract. Once again, the jury was instructed on what constituted a breach of contract, and, viewing the evidence in the light most favorable to UWS, we cannot find that the jury was plainly wrong or without evidence when it concluded that the failure of NRA to make a contractually obligated payment constituted a material breach of contract. *Horton*, 254 Va. at 115. Thus, we find no error in the circuit court's denial of NRA's motion to vacate the verdict.

---

[3] On brief, NRA claims that the jury could have only reached the verdict they did by crediting certain testimony by Makris, which NRA then argues was incredible. Because we find that the jury's verdict did not lack any evidentiary support, as explained above, we need not reach this argument.

The entirety of NRA's argument regarding the circuit court's error in refusing to set aside the jury's verdict as to their counterclaims depends upon their assertion that the evidence showed as a matter of law that UWS committed the first material breach. In essence NRA's assignments of error relating to their counterclaims rise and fall with their assignments of error relating to UWS's breach of contract claims. Since we disagree with NRA's argument, as explained above, we also find no error in the circuit court's refusing to set aside the jury's verdict as to NRA's counterclaims.

D. *The circuit court did not err in striking NRA's affirmative defense of fraudulent invoicing.*

NRA assigns error to the circuit court for striking their affirmative defense of fraudulent invoicing. NRA argues that the evidence adduced at trial, viewed in the light most favorable to it, reflected that the supplemental payments made by NRA to UWS were made pursuant to the same agreements at issue in the trial. Thus, NRA argues, the invoices paid by NRA were fraudulently submitted. We disagree.

Although a court, in determining a motion to strike, must consider the evidence in the light most favorable to the non-moving party and give them the benefit of any reasonable inference or conflict in the evidence, *Dill*, 300 Va. at 109, here, the evidence was plainly inadequate to support NRA's asserted defense. LaPierre expressly testified that the agreement to make supplemental payments was "just a verbal agreement that we had with Mr. Makris that as long as we felt they were effective we could continue to do them." Thus, the record clearly reflects that Makris and LaPierre agreed that Makris would conduct networking events for NRA's benefit and that Makris would be separately paid for this work. While this oral contract appears to have been ill-defined and intertwined with the existing relationship between the parties, based on the testimony at trial, this oral agreement existed and was invoiced separately from the advertising and sponsorship contracts at the heart of this litigation. Hence, the circuit

court did not err in concluding that NRA's contention concerning fraudulent invoicing was inappropriate as an affirmative defense in the present litigation.

E. *The circuit court also did not err in striking NRA's affirmative defense of recoupment.*

NRA also contends that the circuit court erred by striking their affirmative defense of recoupment.[4] We disagree.

First, NRA asserts that it is entitled to recoupment of the payments it expended pursuant to the supplemental invoices received from Makris.

> Recoupment . . . is the right of the defendant to cut down or diminish the claim of the plaintiff in consequence of his failure to comply with some provision of the contract sought to be enforced, or because he has violated some duty imposed upon him by law in the making or performance of that contract.

*Nat'l Bank & Tr. Co. v. Castle*, 196 Va. 686, 695 (1955) (citation omitted). It is well settled that recoupment is only available when "[t]he delinquency or deficiency which will justify the reduction of the plaintiff's claim . . . arise out of the same transaction, and not out of a different transaction." *Id.* Since, the supplemental payments were never a part of the advertising and sponsorship contracts at issue here, as explained above, recoupment based on any alleged fraud in relation to the supplemental invoicing and payments related thereto cannot be recouped in this case under these facts.

NRA also contends that it was error to deny recoupment of any amounts paid for the episodes UWS failed to produce. However, this contention was not preserved for appellate review because it was not made known to the circuit court below. *See* Rule 5A:18 ("No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with

---

[4] NRA's assignment of error speaks of the affirmative defenses of setoff and recoupment. However, NRA's brief only argues regarding recoupment and makes no argument regarding setoff. Therefore, any claims related to the affirmative defense of setoff are waived. *See* Rule 5A:20.

- 12 -

reasonable certainty at the time of the ruling . . . .").  For these reasons, the circuit court did not err in granting the motion to strike NRA's defense of recoupment.

## III.  CONCLUSION

For the foregoing reasons, the judgment of the circuit court is affirmed.

*Affirmed.*